**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JPMORGAN CHASE BANK, N.A.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 06 C 4803** |
| | ) | |
| **v.** | ) | **District Judge Mark Filip** |
| | ) | **Magistrate Judge Geraldine Soat Brown** |
| **HERITAGE NURSING CARE, INC., et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Geraldine Soat Brown, United States Magistrate Judge

Plaintiff JP Morgan Chase Bank ("Chase") alleges that defendants Heritage Nursing Care, Inc., *et al* ("Defendants") defaulted on two promissory notes secured by various of Defendants' assets, including the assets of two nursing home facilities for elderly or infirm patients. (*See* First Am. Compl. ¶¶ 15-17, 25, 31.) [Dkt 8.] Chase now moves for the appointment of what it characterizes as a "limited financial receiver" to monitor the financial activities of the nursing homes and report his findings to the court on a monthly basis. (Plaintiff's Supplemented and Amended Motion for Appointment of Limited Financial Receiver ("Pl.'s Mot.") ¶¶ 25, 26.) [Dkt 36.] Chase's motion was referred to this court for decision. (Order, May 8, 2007.) [Dkt 39.] For the reasons set forth below, Chase's motion is granted.

**JURISDICTION**

As an initial matter, this court must determine whether it has jurisdiction to enter an order

1

on Chase's motion or whether this court must submit a report and recommendation to the District Judge for ultimate decision. A district judge may designate a magistrate judge to hear and determine any nondispositive civil pretrial matter. 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); *see United States v. Brown*, 79 F.3d 1499, 1503 (7th Cir. 1996). With respect to dispositive motions, a district judge may designate a magistrate judge to conduct hearings, including evidentiary hearings, and to submit to the district judge proposed findings of fact and recommendations. 28 U.S.C. § 636(b)(1)(B). Dispositive motions include those specifically identified in 28 U.S.C. § 636(b)(1)(A), such as motions for injunctive relief and motions for summary judgment, as well as other motions not identified in the statute to the extent that they are dispositive of a claim or defense. *See* 12 Charles Alan Wright, Arthur R. Miller, and Richard L. Marcus, *Federal Practice and Procedure: Civil 2d* (hereinafter "Wright & Miller") § 3068.2 at 332-35 (1997).

Although no court in the Seventh Circuit appears to have addressed the issue, two courts in other circuits have held that a magistrate judge has the authority to appoint a receiver. In one case, the court held, in the pretrial context, that a magistrate judge has the authority to appoint a receiver under 28 U.S.C. § 636(b)(1)(A), reasoning that such motions are not dispositive of the rights of the parties nor are they specifically excepted by § 636(b)(1)(A). *Fleet Devt. Ventures, LLC v. Brisker*, 2006 WL 2772686 at *13 (D. Conn. Sept. 12, 2006) (Fitzsimmons, M.J.). In the other case, the court held in the post-trial context that a magistrate judge has the authority to appoint a receiver under the "additional duties" clause of 28 U.S.C. § 636(b)(3). *Bache Halsey Stuart Shields Inc. v. Killop*, 589 F. Supp. 390, 393 (D.C. Mich. 1984).

The District Judge referred the present motion as a nondispositive pretrial discovery motion and did not request a report and recommendation. (Order, May 8, 2007 at 2.) As in the *Fleet* case,

the present motion is a pretrial matter and the jurisdiction to decide this motion is therefore grounded in 28 U.S.C. § 636(b)(1)(A) rather than in the "additional duties" clause of 28 U.S.C. § 636(b)(3). As the court observed in *Fleet*, a motion to appoint a receiver is not specifically excepted by 28 U.S.C. § 636(b)(1)(A). Furthermore, appointment of a receiver whose duties would be monitoring the financial activities of Defendants and reporting to the court would not be dispositive of any claim or defense of any party. *See Fleet*, 2006 WL 2772686 at *13. Thus, this court has jurisdiction to decide the present motion under 28 U.S.C. § 636(b)(1)(A).

## BACKGROUND

### I.     The Parties

Chase alleges that defendant Avigdor Horowitz, also known as Victor Horowitz, ("Horowitz"), is the sole shareholder or member of the other Defendants, including Heritage Nursing Care, Inc. ("Heritage"), Jackson Heights Nursing Center, Inc. ("Jackson Heights"), and North Plaza Nursing Center, Inc. ("North Plaza"). (First Am. Compl. ¶¶ 3, 5, 8, 9, 10.) As the parties' counsel clarified during the evidentiary hearing, Heritage operates a nursing home facility for elderly or infirm patients located in Champaign, Illinois, and Jackson Heights operates a nursing home in Farmer City, Illinois. North Plaza previously operated a nursing home, but no longer does so.

Chase's allegations with respect to the relationships between the various Defendants and Defendants' alleged breach of two promissory notes and guarantees relating to those notes are described in the decision by the District Judge denying Defendants' motion to dismiss the First Amended Complaint. (Order, July 31, 2007.) [Dkt 59]. Chase asserts that Defendants' obligations under both promissory notes are secured by the assets of both the Heritage and Jackson Heights

nursing homes and that, pursuant to the applicable agreements, Chase is entitled to take possession of and liquidate those assets to pay down the obligations owed to it. (*See* First Am. Compl. ¶¶ 16-17, 19-20, Counts II, IV, VI, VII, IX, X; *see also* Pl.'s Mot., Ex. 1 ¶¶ 2-4.) Chase's motion argues that a "limited financial receiver" is necessary because Chase has no confidence in Defendants' financial management of the nursing homes that are the assets securing Defendants' obligations to Chase. (Pl.'s Mot. ¶ 1.) The receiver Chase seeks would not assume custody or management of the nursing homes, but rather monitor Defendants' financial transactions by reviewing out-going payments, inter-company transfers and transfers to insiders, and reporting to the court. (Pl.'s Mot. at 8.)

## II.    Procedural History

The present motion is a supplemented and amended motion; Chase's original motion [dkt 28] had also been referred to this court [dkt 31], but was subsequently stricken without prejudice as moot. (Order, April 10, 2007.) [Dkt 35]. The original motion requested the appointment of Suzanne Koenig as the receiver, and was based largely on reports filed by Ms. Koenig regarding Woodbine, another nursing home owned by Horowitz of which Ms. Koenig had been appointed as receiver in a state court proceeding. (*See* Pl.'s Mot. ¶¶ 4-5, 2.) Defendants objected to the appointment of a receiver in general and Ms. Koenig in particular. Counsel for the parties agreed that Defendants would produce certain documents, and Chase retained Lee J. Chorley of Abrams & Jossel Consulting, to whom Defendants did not object, to visit certain of Defendants' offices and review documents. It was hoped that Mr. Chorley's review would resolve Chase's concerns.

Defendants produced certain financial records, which Mr. Chorley reviewed. (*See* Pl.'s

Mot., Ex. 2, Chorley Aff. ¶ 2.) Following Mr. Chorley's review, Chase brought the present motion, which supplemented the previous motion with additional information, including Mr. Chorley's affidavit laying out his findings regarding Defendants' financial books and records.[1]  In its motion, Chase proposed that Mr. Chorley be appointed receiver.  (Pl.'s Mot. ¶ 26.)

Because Defendants dispute whether the court has authority to appoint a receiver, the parties were ordered to submit memoranda of law on that issue.  (Order, May 31, 2007.)  [Dkt 45.][2] After oral argument, the court determined that legal authority exists to support the appointment of a receiver.  [*See* Dkt 50.]  An evidentiary hearing was held on July 16, 2007.  [Dkt 54.]  The parties submitted exhibits and stipulated as to the admissibility and authenticity of those exhibits that have been considered in this decision.  (Stipulation ("Stip.") ¶¶ 11, 12.) [Dkt 53.]  All of Chase's exhibits are documents that Defendants produced to Chase, except Exhibits I and BB, which are Chase's spreadsheet summaries of Defendants' financial records.  In addition, Chase called a single witness, David Abrams of Abrams & Jossel Consulting, whom Chase now proposes as the receiver instead of Mr. Chorley, because Mr. Chorley is no longer employed by Abrams & Jossel.  Defendants did not call any witnesses on their own behalf.  Defendants submitted four exhibits, which were admitted into evidence without objection.

Defendants object to Mr. Abrams' testimony on a number of grounds.  Defendants assert that Mr. Abrams did not personally review the documents and argue that his testimony was therefore not based on his personal knowledge.  They argue that Mr. Abrams' testimony was inadmissible expert

---

[1]  Chase subsequently filed a corrected copy of Mr. Chorley's affidavit. [Dkt 51.]

[2]  *See* Defendants' Memorandum of Law Addressing Legal Authority for Appointment of Receiver ("Defs.' Mem. of Law") [dkt 46]), and Chase's Reply in Support of Supplemented and Amended Motion for Appointment of Limited Financial Receiver ("Pl.'s Reply") [dkt 48].

testimony. They also argue that Mr. Abrams' testimony regarding what Mr. Chorley reported to him was inadmissible hearsay.

Defendants also object to Mr. Chorley's affidavit because they never had the opportunity to cross-examine Mr. Chorley. Defendants also object to Mr. Chorley's testimony regarding statements made to him by Horowitz on the basis of hearsay.

All of Defendants' objections were overruled during the evidentiary hearing. Although Mr. Chorley conducted the initial investigation, Mr. Abrams testified that he personally reviewed many of the documents. Also, Mr. Abrams testified that he was Mr. Chorley's superior when Mr. Chorley conducted his initial investigation, and that Mr. Chorley's review of the documents was conducted under Mr. Abrams' supervision. Defendants deposed Mr. Abrams before the evidentiary hearing, and had the opportunity to question him on his knowledge of Defendants' financial records and to cross-examine him at the hearing. Mr. Abrams' testimony consisted primarily of describing the data contained in Defendants' documents, and identifying patterns in that data. Mr. Abrams did not add anything to the data, and Defendants also did not present any evidence to refute the substance of the data or the patterns Mr. Abrams pointed out. The court also reviewed the documents to test Mr. Abrams' assertions, as described in more detail below. Understanding the evidence did not require specialized knowledge. *See* Fed. R. Evid. 702. Defendants' objections to Mr. Abrams' testimony are overruled.

Defendants' objection to Mr. Chorley's affidavit was also overruled. Affidavits are ordinarily inadmissible at trial but they may be admitted in summary proceedings, such as preliminary injunction proceedings, because of the need to conduct the proceedings expeditiously. *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1171 (7th Cir. 1997); *see Goodman v. Illinois*

*Dept. of Fin. and Prof. Reg.*, 430 F.3d 432, 439 (7th Cir. 2005) (citing *Ty, Inc.*). The evidentiary

hearing on Chase's motion was a similarly expedited proceeding because of the nature of the relief

requested; thus, Defendants' objection to Mr. Chorley's affidavit was overruled. In reality,

however, Mr. Chorley's affidavit was essentially mooted by the fact that Mr. Abrams, whom

Defendants deposed, testified in person and was subject to cross-examination.

After the evidentiary hearing, the parties submitted trial briefs. (Defs.' Trial Brief in

Opposition to the Appointment of a Receiver ("Defs.' Tr. Br.") [dkt 55]; Pl.'s Reply Trial Brief in

Support of Appointment of Limited Financial Receiver ("Pl.'s Reply Tr. Br.") [dkt 57].)

## FINDINGS OF FACT

The following findings of fact are based on the parties' Stipulation, the exhibits submitted

by the parties, and Mr. Abrams' testimony during the evidentiary hearing. As mentioned above,

Defendants presented no testimony. The facts demonstrate that Defendants do not have even basic

accounting and bookkeeping controls in place, and support Chase's concern that the assets it expects

to secure Defendants' obligations are at risk.

## I.      Records Not Produced; Stipulation Regarding Professional Services

The parties stipulated that Heritage and Jackson Heights "do not possess or otherwise did not

furnish" certain records that Chase had requested, including the following: Bank statements for

certain months in 2005 and 2006; Heritage and Jackson Heights interim financial statements (profit

and loss statements and balance sheet) for the current fiscal year of 2007; Heritage and Jackson

Heights real estate and personal property tax bills for 2005; 2005 State Board of Health survey report

for Heritage and the 2006 State Board of Health survey report for Jackson Heights; Heritage and Jackson Heights financial statements for 2006; Medicare cost report for Heritage (Jackson Heights does not have Medicare residents); and 2006 and 2007 Heritage and Jackson Heights budgets, including capital expense budgets. (Stip. ¶¶ 1(a)-(h).)

Additionally, the parties stipulated that payroll is processed by Defendants' staff. An outside payroll service is not used. (Stip. ¶ 6.) Also, as of March 2007, neither Heritage nor Jackson Heights employed an accountant on staff. (Stip. ¶ 7.)

## II. Unpaid Payroll Taxes

Among the exhibits admitted into evidence were Heritage's and Jackson Heights' quarterly 2006 employer's federal tax returns (IRS form 941). (Exs. A-H.) A total of eight returns were admitted. Each entity's returns for the second, third, and fourth quarters show that payroll taxes for those quarters were not paid at the time the forms were filed. (Exs. B, C, D, F, G, H.)[3] The total amount unpaid by Heritage is $189,316.17, and the total amount unpaid by Jackson Heights is $151,167.81.[4] No evidence was offered to show that payroll taxes were paid at any time after the returns were filed. The parties stipulated that "Defendants were unable to provide any proof of

---

[3] Specifically, six IRS Form 941 returns showed a "$0.00" amount for Line 11, which states: "Total deposits for this quarter, including overpayment applied from a prior quarter." (*See, e.g.*, Ex. B at BT0251.)

[4] The total amount of payroll taxes owed by each entity was calculated by adding the amount recorded on Line 12 (titled "Balance due") of the Form 941 for the second, third, and fourth quarters of 2006. For Heritage, those amounts are: $66,096.45 for the second quarter (Ex. B); $58,067.27 for the third quarter (Ex. C); and $65,152.45 for the fourth quarter (Ex. D). For Jackson Heights, those amounts are: $11,072.32 for the second quarter (Ex. F); $64,171.15 for the third quarter (Ex. G); and $75,924.34 for the fourth quarter (Ex. H).

payment on account of the second through fourth quarter Federal Internal Revenue Service 941s for 2006 for Heritage and Jackson Heights." (Stip. ¶ 8.)  Furthermore, there is no record of any checks made payable to the Internal Revenue Service by either Heritage or Jackson Heights in the 2006 bank statements provided.  (*See* Exs. Q-AA, LL.)[5]

## III.   Bank Account Statements and Bookkeeping Records

Also admitted were various 2005 and 2006 monthly bank statements for both entities.  (Exs. J-AA (Heritage), Exs. KK, LL (Jackson Heights).)  The parties stipulated that Heritage and Jackson Heights each have only one bank account, located at the same bank.  (Stip. ¶ 2.)  As mentioned above, they also stipulated that bank statements for several months were missing from the documents Defendants produced.  (Stip. ¶¶ 1-a, 1-b.)  The last bank statement Defendants produced for either entity is December 2006.

Certain internal bookkeeping records for both Heritage and Jackson Heights were admitted. (Exs. CC (Heritage 2005), DD (Heritage 2006), MM (Jackson Heights 2005), NN (Jackson Heights 2006).)  Those records reflect payments made by Heritage and Jackson Heights for various costs, including medical supplies, mortgage and insurance payments, and waste disposal, and show information such as the check number, the check date, the type of check (manual or computer), the vendor, and the payment amount.

The records support Chase's concerns.  They evidence numerous days on which the bank accounts were overdrawn by large amounts, large payments from Heritage and Jackson Heights to

_____

[5]  The April 2006 bank account statements for both entities were not provided.  (Stip. ¶¶ 1-a, 1-b.)

related entities and unidentified entities, and checks that cleared the bank but that were not recorded on the records.

### A.    Overdrawn Bank Accounts

The Heritage bank account statements record at least one day on which that account was overdrawn during each of four months in 2005 (February, September, October and December), and every month in 2006 except May and June. (Ex. J at BT0067; Ex. N at BT0088; Ex. O at BT0093; Ex. P at BT0098; Ex. Q at BT0005; Ex. R at BT0011; Ex. S at BT0024; Ex. T at BT0028; Ex. V at BT0036; Ex. W at BT0040-41; Ex. X at BT0046; Ex. Y at BT0051; Ex. Z at BT0056; and Ex. AA at BT0062; *see also* Ex. BB at 1-3.)[6]

The Jackson Heights bank account statements record at least one day on which that account was overdrawn during each of seven months in 2005 (February, April, August, September, October, November, and December), and during each of eight months in 2006 (January, March, May, August, September, October, November, and December 2006.  (Ex. KK at BT0403, BT0407, BT0419, BT0424, BT0429, BT0434; BT0439;  Ex. LL at BT0351, BT0361, BT0365, BT0379, BT0384, BT0389, BT0393, and BT0398).

Notably, the frequency of days on which the Heritage account was overdrawn increased in the latter half of 2006.  The January, February, March, May, July, and August 2006 statements record

---

[6] Exhibit BB, entitled "Heritage Nursing Care Inc. Abstract of Bank Statements," prepared by Mr. Chorley, summarizes the daily balance (either negative or positive) of the Heritage account in 2006.  Not every date for each month is listed because daily balances for weekends and holidays do not appear to be recorded on the bank statements.  From the court's review, it appears that the balance amounts listed correspond to the balance amounts listed on the corresponding bank statements.

fewer than five days per month with overdrawn amounts. However, the statements for September, October, November, and December 2006 record over ten days per month with an overdrawn amount, with a total of 18 days in December. A similar pattern exists for the Jackson Heights account, with the number of days with overdrawn balances increasing as the year progressed.

In addition, the overdrawn amounts were as high as the tens of thousands of dollars. For example, on April 30, 2006 (which is recorded on the May 2006 statement), the Heritage account shows a negative balance of $99,557. On December 7, the Heritage account was overdrawn by $34,388.21; on December 15, 2006, the negative balance dropped to $1,132.88; but by December 31, it had increased to a negative balance of $39,900.12. (Ex. BB at 3.) Similarly, on December 4, 2006, the Jackson Heights bank account was overdrawn by $23,547.27; on December 7, 2006, it was overdrawn by $813.32; and on December 20, 2006, it was overdrawn by $31,747.71. (Ex. LL at BT0398.)

### B. Payments to Related Entities

Chase also produced evidence of payments from the bank accounts of both Heritage and Jackson Heights to related entities, including but not limited to defendant Inman Plaza, Inc. ("Inman").[7] That information is summarized on Exhibit I, entitled "Heritage Nursing Care Inc. Summary of Transfers to Related Companies from Heritage Account," which Mr. Chorley prepared

---

[7] Chase alleges that Horowitz is the sole shareholder of Inman, and that Inman guaranteed North Plaza Realty's obligations to Chase. (Am. Compl. ¶¶ 10, 84.) A document entitled "Joinder and Acknowledgment by Guarantors" was executed on behalf of Inman by Horowitz as Inman's President. (Am. Compl., Ex. N.)

from Defendants' documents.[8] From the court's review of Exhibit I, the summary appears consistent with data recorded on the bank statements.[9]

Exhibit I lists 15 checks made out by Heritage to Inman that are recorded (by corresponding check numbers) on Heritage's April 2006 accounts payable report, including five checks dated April 17 or 18, 2006. (Ex. DD at BT0136.) Four of those checks are for $25,000 and one is for $39,000. Exhibit I also lists two checks for $36,000, each dated April 19, 2006, and eight checks for $30,000, each dated April 21, 2006. The April 2006 Heritage bank statement, which would show whether those checks were cashed, was not provided by Defendants, although the May 2006 statement shows that Heritage's bank account was overdrawn by almost $100,000 on April 30, 2006. But the documents do show that several large checks made out by Heritage to Inman cleared the bank: On March 28, 2006, a check for $25,000 was cashed (Ex. S at BT0014), and on May 1, 2006, a $59,000 check was cashed (Ex. T at BT 0015). Exhibit I lists three checks issued from Heritage to Inman dated May 2, 2006 for $40,000 each. The May 2006 bank statement for the Heritage bank account shows that three $40,000 checks with numbers corresponding to those listed in Exhibit I cleared the bank on May 3, 2006. (Ex. T at BT0025.)

The Jackson Heights account demonstrates a similar pattern of large deposits followed by large payments to a related entity. For example, in a series of deposits on March 27, 28, 29, and 31, 2006, a total of $133,000 was deposited into the Jackson Heights account. (Ex. LL at BT0360.) On

---

[8] Although the title of Exhibit I refers only to Heritage Nursing Care, it also contains data relating to Jackson Heights.

[9] Exhibit I may not be a complete summary of checks made payable to Defendants or related entities. For instance, Heritage's October 2006 monthly bank statement records a $12,000 handwritten check made out to "V. Horowitz" or "A. Horowitz" that cleared the account that month (Ex. Y at BT0019), but that is not recorded on Exhibit I.

March 31, 2006, the Jackson Heights account shows that two $30,000 handwritten checks to Inman cleared. (Ex. LL at BT0533.) Jackson Heights issued three $40,000 checks dated May 2, 2006 to Inman. The Jackson Heights accounts payable report for May 2006 reflects the same checks (Ex. NN at BT0498), and the Jackson Heights May 2006 bank statement shows that those checks cleared. (Ex. LL at BT0362).

In addition to payments to Inman, Heritage also made payments to Victor Horowitz and Woodbine, and Jackson Heights made payments to Heritage Nursing Care. (Ex. I.)[10]

Mr. Abrams testified that these checks were evidence of money "going out" from Heritage and Jackson Heights to a related entity, but he saw no records reflecting money "coming in" from those other entities.

Chase also raises questions about certain internet transfers of large, lump-sum payments to unidentified accounts that occurred shortly after large deposits to the Heritage account were made. (Pl.'s Reply Tr. Br. at 9.) For example, on May 1, 2, and 3, 2006, approximately $344,300 was deposited into the Heritage account, and on May 3, 2006, $57,500 was transferred via the internet in even, lump-sum payments ($40,000; $15,000; and $2,500). (Ex. T at BT0015.) There is no evidence regarding the identities of the owners of those accounts or the purpose of those transfers.

### C.    Use of Multiple Check Sequences and Unrecorded Checks

In addition to the specific problems discussed above, the Heritage records reflect the absence

---

[10]  Exhibit I also records payments made to Rock Island Supportive Living, and Sundance Nethadone Treatment, although there is no evidence before this court that those entities are related to Defendants.

of ordinary bookkeeping controls, including sequentially sequenced checks.  For example, the first checks listed on the January 2006 Heritage accounts payable report are check numbers 8870 and 8871, but then the register jumps to a sequence beginning with 9106.  (Ex. DD at BT0133.)  The "8800" sequence continues on the February 2006 report with 8872, 8873, etc., as does the "9100s" sequence.  (Ex. DD at BT0134.)

Some checks that cleared the bank were not recorded on the accounts payable register.  (*See* Chorley Aff. ¶ 12.)  One example is a handwritten $5,000 check dated February 9, 2006, written on the Jackson Heights account and payable to "Heritage Nursing Centre."  It cleared the Jackson Heights account on February 9, 2006.  (Ex. LL at BT0531.)  That check number does not appear on the corresponding February 2006 accounts payable report for Jackson Heights.  (Ex. NN at BT0493.)

## IV.  Checks Payable to "Resident Trust Fund"

Chase identifies six checks, totaling $2,040, made payable to "Heritage Resident Trust Fund" or "Heritage Resident Trust" that cleared the Heritage bank account.  (Pl.'s Reply Tr. Br. at 10 (citing Ex. T at BT0015, Ex. V at BT0017, Ex. W at BT0018).)  Chase also identifies seven entries, totaling $3,030, on the 2005 Heritage accounts payable report listed as paid to "Resident Fund Account."  (Ex. CC at BT0103.)  As Chase notes, no evidence of a "Heritage Resident Trust Fund" or a "Resident Fund Account" was provided by Defendants.

## V.  Defendants' Exhibits

As mentioned above, Defendants' four exhibits were admitted into evidence.  Defendants presented no witnesses on their own behalf.  Two of Defendants' exhibits are print-outs of Medicare

information about Heritage Nursing Center as of April 28, 2006, and Jackson Heights Nursing Home as of November 1, 2006. (Exs. TT and UU.) Those exhibits give information as of those dates about such issues as fire safety and staffing, but say nothing about Defendants' financial conditions or accounting practices. According to Defendants, those reports demonstrate that the Heritage and Jackson Heights facilities are, "on average, significantly better than those in the rest of the State." (Defs.' Tr. Br. at 5.) Defendants' third exhibit is a letter from Chase's counsel listing requested documents. (Ex. VV.) Defendants' final exhibit is a one-paragraph order in a state-court lawsuit between the parties, denying motions by Chase (then Bank One) to dismiss certain affirmative defenses and for summary judgement. (Ex. WW.)

## ANALYSIS

### I. Authority to Appoint a Receiver and Choice of Law

Defendants had originally argued that Illinois law applies to the decision to appoint a receiver. (Defs.' Mem. of Law at 2-3.) In fact, federal law governs that decision. "The appointment of a receiver in a diversity case is a procedural matter governed by federal law and federal equitable principles." *Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 316 (8th Cir. 1993); *see also* 12 Wright & Miller § 2983 at 33. Accordingly, Defendants' arguments based on Illinois law are irrelevant. (*See* Defs.' Mem. of Law at 4-6; Defs.' Tr. Br. at 9.)

Chase requests the appointment of an equitable receiver, which is distinguishable from, for example, a receiver appointed by authority of a statute (*see e.g., In re McGaughey*, 24 F.3d 904, 907 (7th Cir. 1994)), or pursuant to the terms of a contract (*see* 65 Am. Jur. 2d *Receivers* § 4 (updated July 2007)). "Federal courts have an inherent equitable power to appoint a receiver . . . ." *In re*

*McGaughey*, 24 F.3d at 907. The authority to appoint an equitable receiver is part of the federal court's "traditional, common law powers of equity." *Liberte Capital Group, LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006); *see also* 12 Wright & Miller § 2981 at 7-8. While the existence of a specific provision in the loan documents for a receiver would further support the appointment (*see New York Life Ins Co. v. Watt West Inv. Corp.*, 755 F. Supp. 287, 292-93 (E.D. Cal. 1991)), its absence does not mean that none may be appointed.

"An equity receiver is a person specially appointed by the court to take control, custody, or management of property that is involved in or is likely to become involved in litigation for the purpose of preserving the property, receiving rents, issues, or profits, and undertaking any other appropriate action with regard to the property pending its final disposition by the suit." 12 Wright & Miller § 2981 at 8. "A receiver may be appointed to avert further loss of assets through waste and mismanagement." *Tanzer v. Huffines*, 408 F.2d 42, 43 (3d Cir. 1969). To that end, a receiver may either have "active duties, such as the operation of a railroad, utility, or business," or passive duties, which require that he "preserve[] the property, collect[] the assets, and report[] the fund to the court for distribution." 65 Am. Jur. 2d *Receivers* § 1. A receiver is an officer of the court; he does not owe allegiance to the one who sought his appointment, but rather acts as a fiduciary on behalf of both parties. *See Gaskill v. Gordon*, 27 F.3d 248, 251 (7th Cir. 1994); 12 Wright & Miller § 2981 at 9-10.

Appointment of a receiver is an extraordinary remedy and the court should exercise its discretion to appoint one with "care and caution." *Connolly v. Gishwiller*, 162 F.2d 428, 435 (7th Cir. 1947); *see also Aviation Supply*, 999 F.2d at 316-17; *Consolidated Rail Corp. v. Fore River Ry. Co.*, 861 F.2d 322, 326, 327 (1st Cir. 1988). It is the burden of the party seeking the appointment of a receiver to establish that the appointment is warranted. 65 Am. Jur. 2d *Receivers* § 20.

The party seeking a receiver must first "show that he or she has some legally recognized right in that property that amounts to more than a mere claim against defendant." 12 Wright & Miller § 2983 at 20; *see also* 65 Am. Jur. 2d *Receivers* § 10. "Thus, a receiver ordinarily will not be appointed at the insistence of a simple contract creditor, even if he demonstrates the inadequacy of his remedy at law . . . ." 12 Wright & Miller § 2983 at 20; *see Pusey & Jones Co. v. Hanssen*, 261 U.S. 491, 497 (1923) (stating that "an unsecured simple contract creditor has, in the absence of statute, no substantive right, legal or equitable, in or to the property of his debtor"). In contrast, secured creditors "clearly have an interest in the property on which they have a security interest that may provide a basis for convincing the court to appoint a receiver ending a foreclosure suit or any other action to enforce one or more outstanding liens." 12 Wright & Miller § 2983 at 21; *see Pusey*, 261 U.S. at 497 (stating that "[a] receiver is often appointed upon application of a secured creditor who fears that his security will be wasted").

## II.      Factors Considered in Appointment

The factors that have been considered in the decision to appoint a receiver include the following :

1. fraudulent conduct on the part of defendant;
2. the imminent danger of the property being lost, concealed, injured, diminished in value, or squandered;
3. the inadequacy of the available legal remedies;
4. the probability that harm to plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment; and
5. plaintiff's probable success in the action and the possibility of irreparable injury to his interests in the property.

12 Wright & Miller § 2983 at 24-29; *Consolidated Rail*, 861 F.2d at 326-27 (citations omitted);

*Aviation Supply*, 999 F.2d at 316-17 (citations omitted). Those factors are considered in turn.

### A.     Fraudulent Conduct on the Part of the Defendant

Chase has not alleged or presented evidence of fraud, as Chase itself admits. (Pl.'s Reply at 8.)  However, contrary to Defendants' suggestion, a clear showing of fraud is not a prerequisite for the appointment of a receiver.  Fraudulent conduct is only one of several factors a court may consider and need not necessarily be present in order for a receiver to be warranted.  12 Wright & Miller § 2983 at 24-29; *Consolidated Rail*, 861 F.2d at 326-27 (citations omitted); *Aviation Supply*, 999 F.2d at 316-17.

### B.     Risk That Property Will Be Lost, Diminished in Value, or Squandered

The second factor, that there is an imminent risk that the property will be lost, diminished in value, or squandered, is more relevant in this case.  Contrary to Defendants' argument that Chase has produced nothing more than speculation that the nursing homes' assets are at risk, Chase has produced evidence supporting the existence of an imminent risk to its collateral.  For example, Heritage and Jackson Heights paid payroll taxes in the first quarter of 2006, but not in the last quarter.  The number of days per month on which the Heritage and Jackson Heights bank accounts were overdrawn increased in the latter half of 2006, and the overdrawn amounts were often very high, ranging into the tens of thousands of dollars.  On December 31, 2006, the Heritage account was overdrawn by $39,900.12.  (Ex. BB at 3.)  On the same date, the Jackson Heights account had a positive balance of $4,338.74 (Ex. LL at BT0399), although just ten days earlier, on December 20, the account had a negative balance of $31,747.71 (*id.* at BT0398).

18

Even Defendants admit that the evidence showed that "Defendants had poor record-keeping and suffered from cash flow problems. . . ." (Defs.' Tr. Br. at 8.) In fact, the unpaid taxes, the increased frequency of days on which the bank accounts were overdrawn, and the high overdrawn balances suggest that the financial condition of Heritage and Jackson Heights worsened during the latter half of 2006. Defendants produced no evidence to rebut Chase's evidence of that worsening condition. When that condition is coupled with what Defendants admit is evidence of "loan checks" to related entities (*id.*) and transfers of large sums for unidentified purposes, Chase has demonstrated an imminent risk that the assets in which it has a secured interest are in jeopardy. That factor strongly favors the appointment of a receiver.

### C.      Adequacy of Chase's Remedy at Law

 Defendants argue that Chase's remedy is to obtain a judgment for the amount owed, and that until Chase obtains a judgment, appointment of a receiver is premature. (Defs.' Tr. Br. at 12-13.) The case upon which Defendants rely, *Pittsburgh Equitable Meter Co. v. Paul C. Loeber & Co.*, 160 F.2d 721 (7th Cir. 1947), does not support their assertion that Chase cannot obtain a receiver prior to judgment.[11] Chase does not seek a remedy for its injury of nonpayment; instead, Chase seeks a remedy for the injury that would result if Defendants deplete the assets that secure the promissory notes before Chase is able to obtain a judgment. Defendants have not identified a legal remedy that would achieve the end that Chase seeks to achieve through its present motion—preservation of the collateral in which it has a secured interest. The third factor weighs in favor of appointment of a

---

[11] In the *Pittsburgh Equitable* case, the Court of Appeals affirmed the decision of the District Court to appoint a receiver in aid of a judgment creditor. The case did not discuss the appointment of a receiver at the request of a secured creditor prior to judgment.

receiver.

**D.    Balancing of Harms**

The relief that Chase requests is limited; it seeks a receiver who would only monitor, rather than manage, the financial activities of Defendants. The only harm identified by Defendants is the imposition of third-party oversight at Defendants' expense. (Defs.' Tr. Br. at 13.) Defendants propose the alternative that they be permitted to make periodic reports to the court.

Defendants' proposal ignores the history of this case. Chase's original motion was mooted by Defendants' agreement to produce their financial documents. Those documents disclosed that Heritage and Jackson Heights lack even the most basic bookkeeping procedures and have no regular outside professional controls, resulting in records that raise more questions than they answer. The present motion ensued. Based on the evidence presented at the hearing, the court could not rely on reports prepared by Defendants.

Certain Defendants obtained substantial sums from Chase's predecessor banks secured by assets that were intended to guarantee that Chase would be repaid (at least to the extent of the value of the assets) in the event of default. Contrary to Defendants' argument, the fact that Jackson Heights Nursing Center, Inc. may not have received directly any of those sums is irrelevant. Defendant Horowitz, the sole shareholder or member of each of the Defendant entities, pledged the assets of Jackson Heights Nursing Center, Inc. as collateral for sums received by other entities he owned. Chase has demonstrated that those assets are at risk of disappearing before it can obtain a judgment. The fourth factor weighs in favor of appointment of a receiver.

### E.    Chase's Probable Success In the Action

Defendants argue that Chase has not demonstrated the merits of its claim that Defendants have breached any obligations to Chase.  (Defs.' Tr. Br. at 5.)  Defendants rely heavily on the fact that, at the time of the evidentiary hearing and the filing of their trial brief, they had a pending motion to dismiss. Subsequently, that motion was denied, and Defendants' argument that Chase's motion is premature, or brought to influence the decision on the motion to dismiss, is moot.  (Defs.' Tr. Br. at 5, 10, 12-13.)  As the District Judge decided, Chase has adequately alleged claims that Defendants breached obligations secured by the assets of Heritage and Jackson Heights.  The Amended Complaint attaches agreements that are executed by Horowitz as sole shareholder or member of the Defendant entities.  (Order, July 31, 2007 at 5.)  In light of the evidence presented at the hearing, including the absence of any evidence by Defendants beyond the four exhibits discussed above, Chase has demonstrated sufficient likelihood of prevailing on the merits to justify the limited relief that it now requests.


### CONCLUSION

For the reasons set forth above, Chase's motion for appointment of a limited financial receiver is granted.  David Abrams of Abrams & Jossel is appointed Limited Financial Receiver for the purpose of monitoring the financial transactions of Heritage Nursing Care, Inc., Heritage Nursing Center LLC, and Jackson Heights Nursing Center, Inc.  He shall be compensated by Defendants for his services and reasonable expenses incurred.  The court will enter a further order detailing the scope of the Limited Financial Receiver's duties, including the reports he will submit to the court and the terms of his compensation.  No later than September 17, 2007, counsel for the parties shall

meet and confer in an attempt to agree upon the terms of the order to be entered. Defendants' good faith participation in that meeting will not be a waiver of any argument they have made in opposition to the appointment. This matter is set for a status hearing on September 26, 2007 at 10:30 a.m., and for submission of a joint proposed order. If no joint order can be agreed upon, alternative proposed orders may be submitted with the areas of disagreement clearly identified (for example, by italics or boldface). The proposed order shall be complete and specific, and shall not incorporate by reference any other document or use terms defined in any other document.

**IT IS SO ORDERED.**

**GERALDINE SOAT BROWN**
**United States Magistrate Judge**

**September 6, 2007**